FARMERS INSURANCE EXCHANGE, an insurer, and owner of Mid–Century Insurance Company; and Mid–Century Insurance Company, a California corporation, Petitioners

v.

Marc A. BENZING, on behalf of himself and all others similarly situated, Respondent.

No. 07SC483.

Supreme Court of Colorado,
En Banc.

April 27, 2009.

Davis Graham & Stubbs LLP, Thomas P. Johnson, Janette L. Ferguson, Denver, Colorado, Attorneys for Petitioners.

The Carey Law Firm, Robert B. Carey, Leif Garrison, Colorado Springs, Colorado,

Walter H. Sargent, a professional corporation, Walter H. Sargent, Colorado Springs, Colorado, Attorneys for Respondent.

Arnold & Porter LLP, Timothy R. MacDonald, James E. Scarboro Denver, Colorado, Attorneys for Amici Curiae Colorado Civil Justice League, Colorado Association of Commerce and Industry, Colorado Competitive Council, and Denver Metro Chamber of Commerce.

Roberts Levin Rosenberg PC, Bradley A. Levin, Alexa R. Salg, Denver, Colorado, Attorneys for Amicus Curiae The Colorado Trial Lawyers Association.

Hill & Robbins, P.C., Robert F. Hill, John H. Evans, Nathan P. Flynn, Denver, Colorado, McFarland Law Offices, Thomas D. McFarland, Golden, Colorado, Evans & McFarland, LLC, M. Gabriel McFarland, Luke McFarland, Golden, Colorado, Attorneys for Amici Curiae John Quinn, Marcia Quinn, and Lynn Young.

Justice BENDER delivered the Opinion of the Court.

### Introduction

In this case, we review whether the court of appeals erred in holding that the trial court abused its discretion when it decertified the plaintiff's class. *Benzing v. Farmers Ins. Exch.*, 179 P.3d 103 (Colo.App.2007). The plaintiff alleged, inter alia, that the defendant automobile insurance companies violated the Colorado Consumer Protection Act (CCPA) when they failed to disclose to insurance purchasers this court's decision in *DeHerrera v. Sentry Insurance Co.*, 30 P.3d 167 (Colo.2001). As a consequence of *DeHerrera*, insureds, once they have purchased the first unit of uninsured/underinsured motorist (UM/UIM) coverage, need not purchase additional UM/UIM coverage on a second vehicle in order to protect themselves and resident family members. *See id.* at 176.

The trial court initially certified the class, accepting as true the plaintiff's allegation that he and the class of insureds purchased UM/UIM coverage on additional vehicles that provided no meaningful benefits. The case was then transferred to another trial judge who, after the parties undertook partial discovery, ruled that the UM/UIM coverage on additional vehicles did in fact provide a benefit: UM/UIM protection for guests and nonresident family members traveling in those vehicles. Concluding that "mini-trials" would be necessary to determine if the defendants' alleged failure to disclose *DeHerrera* caused injury to any of the insureds, the court ruled that the plaintiff's original class certification was inappropriate.

On appeal, the court of appeals reversed. *Benzing*, 179 P.3d at 115. In doing so, the court of appeals primarily relied on the plaintiff's argument that the CCPA's causation element could be established using the fraud on the market theory. *Id.* at 112–14. Because this theory could eliminate the need to prove individual causation, the court of appeals held that the trial court abused its discretion in decertifying the class. *Id.*

Upon review, we hold that, under the circumstances of this case, the fraud on the market theory cannot be applied to maintain a class action. The fraud on the market theory is a judicially created presumption typically employed by plaintiffs in securities class actions to prove the reliance element of a section 10(b) and rule 10b–5 securities fraud claim. Here, the plaintiff class did not allege reliance on both the market price of the policies and the integrity of the market. Rather, the class alleges reliance upon the defendant's omissions in face-to-face transactions. Thus, market price is not the causal impetus of the plaintiff class's reliance. In addition, a plaintiff class attempting to invoke the fraud on the market theory must demonstrate that the market at issue is efficient; that is, the market price promptly reflects all available material public information. The class here did not and cannot demonstrate that the market for commercial UM/UIM insurance is efficient. Lastly, our decision in *DeHerrera* was public information at the time of the class's alleged reliance, and so the success of the plaintiff class's substantive CCPA claims actually depends on the inefficiency of the market for commercial UM/UIM insurance.

In addition, the plaintiff argues to us an alternate theory of causation. The plaintiff argues that causation may be presumed on a

class-wide basis where there is a uniform material omission or misrepresentation. This presumption is akin to the presumption articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). However, this theory was not raised in the trial court, not considered by the court of appeals, and we therefore reach no opinion as to the merits of this argument.

Because the plaintiff advanced no theory of class-wide causation sufficient to maintain a class action, we hold that the trial court did not abuse its discretion when it decertified the class. Hence, the court of appeals' judgment is reversed. We remand this case to the court of appeals to be returned to the trial court with directions to enter judgment consistent with this opinion.

## Facts and Proceedings Below

The plaintiff, Mark Benzing, sued Mid–Century Insurance Company and its parent company, Farmers Insurance Exchange, alleging that the insurers sold him UM/UIM coverage using deceptive trade practices by failing to disclose to him this court's decision in *DeHerrera v. Sentry Insurance*, 30 P.3d 167 (Colo.2001).[1] In *DeHerrera*, we held that UM/UIM coverage applies to an insured person and his or her resident relatives when injured by a financially irrespon-

sible motorist, irrespective of the vehicle that the insured or resident relative occupies at the time. *Id.* at 176. In light of this court's decision in *DeHerrera*, a division of the court of appeals invalidated "owned but not insured" policy exclusions, which limited coverage, including UM/UIM coverage, to insureds injured when occupying a vehicle insured under that policy. *Jaimes v. State Farm Mut. Auto. Ins. Co.*, 53 P.3d 743 (Colo.App.2002).[2]

Benzing and his wife bought automobile insurance from Farmers on a first vehicle in 1997, and then bought additional coverage for a second vehicle in 1999. Both policies contained UM/UIM insurance. Benzing alleged that, after the *DeHerrera* and *Jaimes* decisions, Farmers continued to sell UM/UIM coverage on a per vehicle basis without telling insureds that they need not purchase UM/UIM insurance on each household vehicle to cover the insureds and their resident relatives. Benzing brought this lawsuit claiming, inter alia, that Farmers committed a deceptive practice under the Colorado Consumer Protection Act (CCPA), sections 6–1–101 to–1120, C.R.S. (2006), by selling UM/UIM coverage on a per vehicle basis without disclosing the implications of *DeHerrera* and *Jaimes* to the insureds.[3]

Benzing then moved for class certification pursuant to C.R.C.P. 23. The trial court

1. In *DeHerrera v. Sentry Insurance Co.*, we considered whether an insurance company was required to pay UM/UIM benefits where the named insured's son, while riding an uninsured motorcycle, was struck by an underinsured motor vehicle. 30 P.3d 167, 171 (Colo.2001). We held that UM/UIM insurance applies to an insured irrespective of the vehicle the injured insured occupies at the time of injury. *Id.* at 176. Applying that holding to the facts at hand, we concluded that the injured motorcyclist, as a resident relative of the named insured, was a person insured under the policy, and thus that the insurance company was required to compensate him for damages. *Id.*

2. In *Jaimes v. State Farm Mutual Automobile Insurance Co.*, the plaintiff owned two cars; one insured in his name with a UM/UIM limit of $25,000, the other insured under a separate policy in his wife's name with a limit $100,000. 53 P.3d 743, 744 (Colo.App.2002). The plaintiff was injured while driving the car insured with the $25,000 limit, but sought UM/UIM benefits under the policy with the $100,000 limit. *Id.* The insurance company argued that the "owned but

not insured under this policy" exclusion in the $100,000 policy exempted coverage because the plaintiff, although technically "insured" under the $100,000 policy because he was married to and resided with the named insured, was injured while driving a vehicle not insured under that policy. *Id.* at 744–45. Relying on *DeHerrera*, the court of appeals found that the "owned but not insured" policy exclusion was void as against public policy, because the UM/UIM statute was intended to protect persons insured under the policy, irrespective of the vehicle they occupied at the time of the accident. *Id.* at 746–47.

3. Benzing also brought claims for declaratory relief, breach of contract, and bad faith breach of contract based on Farmers' decision to pay only the lower level of UM/UIM insurance as contained in his second vehicle's policy after Benzing was injured by an uninsured motorist. After this lawsuit was initiated, Farmers paid the higher amount of UM/UIM coverage, and only Benzing's CCPA claims are at issue in this appeal.

certified a class of all persons insured by the defendants with multiple policies, at least two of which contained UM/UIM coverage, who purchased or renewed their policies after the *DeHerrera* decision was issued. For the purposes of class certification, the court accepted as true the plaintiff's allegation that the additional UM/UIM policies "provided no meaningful benefit to the purchaser." While the trial court noted there was some factual dispute as to what representations were made by the defendants' insurance agents to each of its insureds, the defendants primarily argued that they had no duty to disclose the *DeHerrera* decision to any of its insureds, and thus the court found the proposed class satisfied the "commonality" and "typicality" prerequisites of C.R.C.P. 23(a). It noted that the damages calculation, consisting of excess premiums that provided no benefits to insureds, was suited for resolution by a court-appointed master. The court also concluded that the class was maintainable under C.R.C.P. 23(b)(3) because common questions of law and fact predominated over individual issues.

Following partial discovery, the defendants moved to decertify the class on the basis that benefits did accrue at least to some class members purchasing additional policies with UM/UIM insurance. *DeHerrera* and *Jaimes* only require that the insureds and their resident family members are covered on all vehicles after they purchase one policy with UM/UIM coverage. Purchasing UM/UIM coverage on additional vehicles extends UM/UIM protection to guests and nonresident relatives of the insureds traveling in the added vehicles.

Defendants cited Benzing's own deposition testimony that, if given the choice between purchasing UM/UIM coverage that protected his guest passengers and nonresident relatives and coverage that did not, he would choose the broader, additional coverage. The defendants also introduced under seal statistical evidence obtained from another company, State Farm Insurance, which indicated that after State Farm's mass mailing to Colorado policyholders disclosing the import of *DeHerrera*, there were relatively few requests for cancellation of UM/UIM coverage on additional vehicles. Because a plaintiff asserting a private cause of action under the CCPA must show that the defendant's deceptive trade practice *caused* an *injury* to the plaintiff, the defendants argued liability could not be established on a class-wide basis because the class would not be able to show that defendants' alleged non-disclosure of *DeHerrera's* implications affected their decisions to purchase additional coverage. *See Hall v. Walter*, 969 P.2d 224, 234–35 (Colo. 1998).

Opposing decertification, Benzing argued that liability could be shown on a class-wide basis because the complaint alleged that the same illegal conduct was directed to all policyholders. He further argued that all insureds who purchased additional policies consisting of UM/UIM coverage were entitled to full refunds of their premiums. Alternatively, he argued that he and other insureds were "duped into paying more than they would have paid" had the market been fully informed of the product's worth, and alleged that the harm to the class could be measured in the aggregate through statistical evidence as to the value of coverage actually sold.

In support of this theory, Benzing, by way of affidavit, stated that, with knowledge of *DeHerrera*, he would want UM/UIM coverage on a second vehicle to protect guests and nonresident family members *only* if the price reflected the nature of the diminished coverage. The plaintiff's expert averred that, like Benzing, "no consumer ... would pay approximately the same premium for just the second unit of [UM/UIM] protection if it provides no benefit to the individual or his/her resident family members." This factual setting formed the basis for the plaintiff's fraud on the market theory, which he later argued on appeal to the court of appeals.

Nonetheless, the trial court, with a different judge presiding, ruled that Benzing was no longer an adequate class representative, and that his claims were not typical of other class members', because he would have purchased the additional insurance despite knowledge of *DeHerrera*. In doing so, the trial court implied that Benzing, and others who would have purchased the additional in-

surance, would "have no claim for recovery" under the CCPA.

The trial court reasoned that replacing Benzing with another representative who would not have purchased the additional insurance would not support the maintenance of the class because individual findings still would be necessary to determine what coverage each class member would have chosen had full disclosure of *DeHerrera* occurred. To support this conclusion, the trial court cited the State Farm evidence, which indicated that most consumers did not cancel multiple UM/UIM policies even after *DeHerrera* was disclosed. As a result, the trial court concluded that the plaintiff could not show how causation could be established on a class-wide basis. Thus, the court held that individual issues predominated over common ones, and decertified the class. *See* C.R.C.P. 23(b)(3).[4]

On appeal, a division of the court of appeals held that the trial court abused its discretion in decertifying the class. *Benzing*, 179 P.3d 103.

As a preliminary matter, the court stated that the defendants' argument for decertification, i.e., that the additional UM/UIM coverage did in fact provide "meaningful benefits" by covering guests and nonresident relatives, was not based on new evidence and thus should not have been considered by the second trial judge. *Id.* at 109.

The appellate court went on to rule that, even if the "meaningful benefits" argument made by the defendants was properly considered by the trial court, the trial court abused its discretion when it decertified the class. *Id.* It reasoned that some class members might be entitled to full refunds of premiums

for UM/UIM coverage on additional policies because had *DeHerrera* been disclosed they would not have wanted coverage for guests and nonresident family members. *Id.* at 112. The court stated that although the plaintiff's deposition testimony indicated that he was not entitled to a full refund, the plaintiff might recover a partial refund under the fraud on the market theory. *Id.*

Proceeding on the fraud on the market theory, the court of appeals stated the plaintiff could establish "the causation element [necessary for his CCPA claims] by proof of how defendants' alleged non-disclosure affected the market price for additional vehicle coverage." *Id.* at 112. Thus, it held that the plaintiff's claims were typical of other class members' claims because the focus of the litigation would not be whether or how the plaintiff's injury differed from those who might be entitled to a full refund. *Id.* The court of appeals further held that the trial court abused its discretion when it ruled that individual issues predominated over common ones because the court of appeals reasoned that causation and damages might be demonstrated on a class-wide basis using the fraud on the market theory. *Id.* at 113–14. Although the court questioned whether the plaintiff would ultimately succeed in applying the fraud on the market theory to a case outside of the securities fraud context, it found this legal theory sufficient to maintain a class action. *Id.* at 111–12.

From this decision, the defendants appeal.[5]

## Standard of Review

▇▇ We review a trial court's decision to certify a class in the first instance for an abuse of discretion. *See, e.g., State v. Buckley Powder Co.*, 945 P.2d 841, 844 (Colo.

---

**4.** The trial court also did not allow a class action to be maintained under either C.R.C.P. 23(b)(1) or (b)(2). However, neither of these decisions was raised on appeal to this court.

**5.** We granted certiorari on the following three issues:

1. Whether Colorado should extend the federal securities-law doctrine of "fraud-on-the-market" to relieve plaintiffs of the burden of proving causation of injury in class actions alleging non-securities claims such as insur-

ance bad faith and violation of the Colorado Consumer Protection Act.

2. Whether a trial court is precluded from decertifying a class based on a ground that defendants did not assert at the initial certification hearing, where the evidence supporting that ground was not discovered until after the hearing.

3. Whether the court of appeals improperly reweighed the evidence and substituted its assessment for the trial court's in reviewing the trial court's decision to decertify a class.

1997). Because no Colorado authority articulates the standard of review for a decertification order, we look to case law interpreting C.R.C.P. 23's federal counterpart, Fed. R. Civ. Proc. 23, for guidance, given that the language of the two rules is virtually identical. *Goebel v. Colo. Dep't of Insts.*, 764 P.2d 785, 794 n. 12 (Colo.1988); *see also Medina v. Conseco Annuity Assurance Co.*, 121 P.3d 345, 348 (Colo.App.2005). Federal jurisdictions, including the Tenth Circuit, apply an abuse of discretion standard to review decertification orders. *Paton v. New Mexico Highlands Univ.*, 275 F.3d 1274, 1278 (10th Cir.2002); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir.2001); *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir.1995); *Key v. Gillette Co.*, 782 F.2d 5, 6–7 (1st Cir.1986); *Briggs v. Anderson*, 796 F.2d 1009, 1017 (8th Cir.1986); *Samuel v. Univ. of Pittsburgh*, 538 F.2d 991, 996 n. 5 (3d Cir.1976). We apply that standard of review here. Accordingly, we will only reverse a trial court's decertification order that is manifestly arbitrary, unreasonable, or unfair. *See Medina*, 121 P.3d at 347.

### Overview of Class Action Certification Requirements

■ As a prerequisite to class certification, the plaintiff must show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. C.R.C.P. 23(a).

The plaintiff must also demonstrate that it meets one of the three subsections of 23(b) necessary to maintain a class action. Here, the second trial judge and the court of appeals focused on C.R.C.P. 23(b)(3), which requires that questions of law or fact common to the class predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for the fair and efficient resolution of the controversy.

■ While the burden is on the plaintiff to demonstrate that the requirements for a class action have been met, C.R.C.P. 23 should be liberally construed in light of its policy of favoring the maintenance of class actions. *LaBerenz v. Am. Family Mut. Ins. Co.*, 181 P.3d 328, 333–34 (Colo.App.2007), *cert. denied*, 2008 WL 1701094 (Colo. Apr. 14, 2008). In addition, a court must generally accept as true the allegations in support of certification. *E.g., Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir.2009); *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D.Ill.2003). Finally, as discussed in the section on C.R.C.P.'s 23(b)(3)'s predominance requirement, *infra*, although the court may analyze the substantive claims and defenses that will be raised to determine whether class certification is appropriate, it cannot prejudge the merits of the case. *Clark v. Farmers Ins. Exch.*, 117 P.3d 26, 31 (Colo. App.2004); *Ammons v. Am. Family Mut. Ins. Co.*, 897 P.2d 860, 863–64 (Colo.App. 1995).

■ The rules provide that the trial court's certification order on the maintainability of a class action "may be conditional, and may be altered or amended before the decision on the merits." C.R.C.P. 23(c)(1). The trial court's order "is not final or irrevocable, but rather, it is inherently tentative." *Officers for Justice v. Civil Serv. Comm'n of City & County of S.F.*, 688 F.2d 615, 633 (9th Cir.1982). Thus, once a court certifies a class, it retains a "continuing obligation to review whether proceeding as a class action is appropriate...." *Ellis*, 217 F.R.D. at 419; *cf. Key*, 782 F.2d at 7 (noting a court's ongoing duty to make sure that the representation of the class is adequate at all stages of the litigation).

### Procedural and Evidentiary Issues Relevant to Class Certification

The second trial judge decertified the class based on the defendants' argument that, contrary to the first trial judge's assumption, some purchasers received "meaningful benefits" on UM/UIM policies for additional vehicles and thus individual inquiries would be necessary to determine the extent to which each class member relied on the insurer's alleged failure to disclose *DeHerrera's* impli-

cations. To support its ruling, the court cited the plaintiff's deposition testimony that he would have purchased UM/UIM insurance to cover guests and nonresident family members, as well as the statistical evidence from State Farm cited earlier.

The court of appeals suggests that this evidence should not have been considered because the defendant could have, but did not, present its "meaningful benefits" argument prior to the initial certification order. *Benzing,* 179 P.3d at 109. By comparing *DeHerrera's* language to the UM/UIM language of defendants' second vehicle policies, the court of appeals reasoned that defendants could have "immediately ascertained" that the additional policies provided meaningful benefits because they extended benefits to guests and nonresident family members. *Id.* at 108–09. The court cited cases from outside jurisdictions holding that, in order to permit greater reliance on certification orders, a court may not decertify without support from new facts or law. *Id.* at 110 (citing, e.g., *In re Harcourt Brace Jovanovich, Inc. Sec. Litig.,* 838 F.Supp. 109, 115 (S.D.N.Y.1993)). Although we have found no authority on point in Colorado, we note that the Federal District Court for the District of Colorado endorsed the principle that a decertification order must rest on new facts or law. *See Cook v. Rockwell Int'l. Corp.,* 181 F.R.D. 473, 477 (D.Colo.1998) (noting that after certification, "parties can be expected to rely on" the decision, but that "developments in the litigation, such as the discovery of new facts or changes in parties or in the substantive or procedural law" may necessitate review of the certification order) (internal quotations omitted).

 Generally, we agree that trial courts should not consider decertification without the discovery of new facts or changes in the law or positions of the parties. Under the circumstances of this case, however, we conclude that the second trial judge possessed sufficient new information to exercise his discretion to re-examine the certification order as part of his "continuing obligation to review whether proceeding as a class action is appropriate." *Ellis,* 217 F.R.D. at 419. Be-

cause the order initially certifying a class is "inherently tentative," *Officers for Justice,* 688 F.2d at 633, the trial court retains the discretion to modify or decertify the class "as the case develops." *Vaszlavik v. Storage Tech. Corp.,* 175 F.R.D. 672, 683 (D.Colo. 1997); *see also Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998) ("District courts are required to reassess their class rulings as the case develops."); *Richardson v. Byrd,* 709 F.2d 1016, 1019 (5th Cir.1983) ("[T]he district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case....."). At all times, the court must ensure that the class action requirements are met. *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1145 (8th Cir.1999) ("A district court has a duty to assure that a class once certified continues to be certifiable under Fed.R.Civ.P. 23(a)."). In particular, where there is evidence that the court may be required to undertake individualized inquiries to resolve issues of liability, the court retains the discretion to modify or decertify the class. *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 63 (3d Cir.1994).

Here, central to the first trial judge's certification order was the plaintiff's theory that the additional coverage provided no meaningful benefits. The defendants' tendered evidence indicated that this basic premise of the initial certification was questionable. This evidence also appeared to support the defendants' argument that individual inquiries as to whether the defendants caused injury to each of the class members might be required, and thus that issues individual to the class might predominate over common ones. Hence, based upon consideration of the reasoning of the first judge and the presentation of this evidence, we conclude that it was within the decertification court's discretionary authority to re-examine the rationale of the first judge's order of certification. As a result, we address the primary basis of the court of appeals' reversal of the decertification order.

### Predominance[6]

At the crux of both the trial court's decertification order and the court of appeals' re-

---

6. In this opinion, we address C.R.C.P. 23(b)(3)'s predominance requirement for the maintenance

versal of that order was an inquiry into whether the class could be maintained on a theory that the defendants caused the class injury by failing to disclose *DeHerrera's* implications to insureds. Absent a class-wide method to prove causation, individual issues would predominate over common ones because separate inquiries would be necessary to determine the defendants' liability as to each class member.

■ We note at the outset that, in considering whether to maintain a class under C.R.C.P. 23(b)(3), a court may not decide the substantive claims and defenses of the parties. *Medina*, 121 P.3d at 348; *Clark*, 117 P.3d at 31. The trial court may not determine whether the class will ultimately succeed in establishing each element necessary to prove its claims. *See* Newberg, *supra*, § 3:29, at 440–41. Accordingly, it was error for the trial court to suggest in its decertification order that those who would have purchased additional policies after being informed about *DeHerrera's* implications could not recover.

■ Some inquiry into the plaintiff's theory of the case, however, is necessary to ensure that common class issues predominate over individual ones. *See Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J.Super. 31, 752 A.2d 807, 813 (2000) (noting importance of examining "the movant's underlying theories of liability, the proofs necessary to establish them, and the predictable defenses to the legal claims"). The requirement of predominance is met where the plaintiff advances a theory by which to prove or disprove "an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 580 (D.Minn.1995); *see also Medina*, 121 P.3d at 348 ("The focus for the trial court is whether the proof at trial will be predominantly common to the class or primarily individualized.").

Here then, the issue most relevant to the predominance requirement, and thus the maintenance of the class question, is whether the plaintiff has a method to establish, on a class-wide basis, that the defendants caused injury to insureds by failing to disclose *DeHerrera's* implications to them. The court of appeals held that the plaintiff's fraud on the market theory might demonstrate causation on a class-wide basis. *Id.* at 110, 112–14. The plaintiff argues that we should affirm the court of appeals' holding on this issue. In addition, the plaintiff, for the first time, puts forth an alternate theory of causation based on a presumption similar to the presumption established by the Supreme Court in *Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. 1456, for securities fraud cases. We reject the fraud on the market theory as applied to this case and do not consider the plaintiff's alternate argument of causation because it was not adequately raised below. Hence, we hold that the trial court did not abuse its discretion in decertifying the class.

## A. Fraud on the Market

The plaintiffs argue that the class could rely on the fraud on the market theory to maintain class certification. We summarize why the fraud on the market theory fails here. First, the plaintiff class relied on the defendants' alleged omissions in face-to-face transactions; the class did not rely on the market price of the insurance policies. Second, commercial auto insurance does not trade in an efficient market and, therefore, the plaintiff class could not rely upon the price of the policies as reflecting all publicly available information. Third, even if we were to assume that commercial auto insurance did trade in an efficient market, our decision in *DeHerrera* was public information at the time the plaintiff class purchased or renewed their policies. Thus, if the fraud on the market theory were applicable, the market price of the policies would reflect our decision and, consequently, the class could not have suffered any harm. Indeed, the

---

of a class action. Finding this inquiry dispositive to the question of whether the trial court abused its discretion in decertifying the class, we do not examine the other class action requirements. *See Medina v. Conseco Annuity Assurance Co.,*

121 P.3d 345, 347 (Colo.App.2005) ("Because we conclude that [the plaintiff] did not satisfy the requirements of C.R.C.P. 23(b), we need not address the requirements of C.R.C.P. 23(a).").

basis of plaintiff class's claim is that the market for insurance is *not* efficient and that, therefore, the price of the policies was subject to manipulation by insurance agents through their suppression of otherwise public information.

■■ The fraud on the market theory is a judicially created presumption of reliance allowing investors who were induced to trade securities, not by any direct reliance on a misrepresentation by the defendant, but rather in reliance on the market price of the securities, to nonetheless state a claim under section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b) (2009), and rule 10b–5(b) thereunder, 17 C.F.R. § 240.10b–5 (2009). *Basic, Inc. v. Levinson,* 485 U.S. 224, 241–245, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The theoretical basis for the fraud on the market theory is that an open and developed securities market exhibits semi-strong market efficiency. *Basic,* 485 U.S. at 241–42, 108 S.Ct. 978; *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir.1986). That is, in such a market, the price of an issuer's securities is determined by all the available public information regarding the company and its business. *Basic,* 485 U.S. at 241–42, 108 S.Ct. 978; *Peil,* 806 F.2d at 1160–61. Market professionals, like arbitrageurs, portfolio managers, brokers, and analysts, act as the primary mechanism by which all available public information is promptly impounded into the price of an issuer's securities. *In re PolyMedica Corp. Secs. Litigation,* 432 F.3d 1, 9 (1st Cir.2005); Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency,* 70 Va. L.Rev. 549, 569–73 (1984). Market professionals remain alert to developing information about an issuer and, based on the available public data, move securities to informed price levels. *Id.* In this way, the price of a given class of securities represents a sort of consensus among informed investors about what those securities are worth based on all the available public information. James D. Cox et al., *Securities Regulation: Cases and Materials* 105–06 (5th ed.2006). If some of the information disseminated to the public is false or misleading, the price will reach an incorrect level and will remain there until the truth is finally broadcast to the market. *Basic,* 485 U.S. at 246,

108 S.Ct. 978; *Peil,* 806 F.2d at 1160–61. Thus, the fraud on the market theory describes the mechanism by which material misinformation disseminated publicly in the marketplace affects traders who were personally unaware of that information. *West v. Prudential Secs., Inc.,* 282 F.3d 935, 938 (7th Cir.2002). Because material misinformation affects market price and because traders in a public market rely on the market price and the integrity of the market, the traders have ipso facto relied on the misinformation because they would have traded at another price, or not at all, had the truth been known. *Basic,* 485 U.S. at 241–42, 108 S.Ct. 978.

■ In the present case, application of the fraud on the market theory is inappropriate. The class members all allege direct reliance on the material omissions of the defendant in face-to-face transactions, rather than reliance on the market price of the UM/UIM policies in an impersonal and efficient market. Hence, the plaintiff class may not couch proof of their reliance in terms of indirect reliance on market price because market price is not the accurate causal impetus of plaintiffs' reliance in this case.

■ Indeed, in the securities context, where face-to-face transactions are concerned, plaintiffs will ordinarily be required to demonstrate familiarity with an allegedly false or misleading statement in order to state a claim under section 10(b) and rule 10b–5. *See, e.g., Basic,* 485 U.S. at 244, 108 S.Ct. 978 ("In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price.") (internal quotations omitted); *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 413 (5th Cir.2001) ("Reliance, in other words, generally requires that the plaintiff have known of the particular misrepresentation complained of, have believed it to be true and because of that knowledge and belief purchased or sold the security in question."); Cox et al., *supra,* at 696 ("[I]n a case involving ... a face-to-face,

arms-length transaction involving an affirmative misrepresentation—the plaintiff will at least have to show enough familiarity with the document or other communication that contained the alleged falsity to negate the possibility that the transaction would have gone forward on identical terms even had there been full disclosure."). This is because investors deceived in face-to-face transactions, as the plaintiffs allege they were here, do not rely on the integrity of market price in an impersonal market, they rely on communications made by another in the course of highly personal transactions.

 Additionally, a plaintiff class's successful invocation of the fraud on the market theory in the section 10(b) and rule 10b–5 context hinges on the premise that the issuer's securities traded in a well-developed, impersonal, and efficient market. *See, e.g., Basic,* 485 U.S. at 241–46, 108 S.Ct. 978; *PolyMedica,* 432 F.3d at 7; *Feinman v. Dean Witter Reynolds, Inc.,* 84 F.3d 539, 541–42 (2d Cir.1996); *Hayes v. Gross,* 982 F.2d 104, 107 (3d Cir.1992). An inability to prove market efficiency is fatal to the class's claim. *See, e.g., Basic,* 485 U.S. at 241–45, 108 S.Ct. 978; *PolyMedica,* 432 F.3d at 7; *Feinman,* 84 F.3d at 541–42; *Hayes,* 982 F.2d at 107. In a widely cited opinion, the Federal District Court for the District of New Jersey set out a five factor test outlining the circumstances under which a court might conclude that the market for a particular security is efficient: (1) average trading volume; (2) the number of security analysts following and reporting on a stock; (3) the presence of market makers and arbitrageurs; (4) a company's eligibility to register securities under Form S–3;[7] (5) a cause and effect relationship between unexpected news and immediate response in stock price. *Cammer v. Bloom,* 711 F.Supp. 1264, 1286–87 (D.N.J. 1989). Other courts have articulated additional factors. *See Unger v. Amedisys, Inc.,* 401 F.3d 316, 323 (5th Cir.2005). Clearly,

these factors, particularly the first and fourth, act as a proxy for determining, among other market characteristics, whether the market for the security is active. *See, e.g., Cammer,* 711 F.Supp. at 1286 ("Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption.") (internal citations omitted); *id.* at 1287; *In re Ribozyme Pharm. Inc., Secs. Litigation,* 119 F.Supp.2d 1156, 1164–65 (D.Colo.2000); 4 Thomas Lee Hazen, *The Law of Securities Regulation* § 12.10, at 135 (6th ed. 2009) ("It is axiomatic that the fraud on the market presumption depends on the existence of an active market."). When a security is actively and heavily traded, the indication is that professional investors and arbitrageurs are promptly, indeed immediately, impounding public information into stock price by moving it to informed levels. *Cammer,* 711 F.Supp. at 1286. In contrast, where the securities of less-widely traded companies are at issue, such as small-cap and over-the-counter stocks, even evidence of the presence of a large number of market makers without sufficient evidence of wide and active trading will be insufficient to show that the market is efficient. Hazen, *supra,* § 12.10, at 136 (collecting cases).

The market for commercial UM/UIM insurance is not simply a "thinly traded" one. Commercial insurance is *not* traded. There is no "market," within the meaning of the fraud on the market theory, for commercial insurance at all. This is fatal to plaintiff class's ability to rely on the fraud on the market theory to prove reliance because there is no mechanism by which all available public information is promptly impounded into the price of commercial automobile insurance.[8]

---

**7.** Form S–3 registration is available to so-called "seasoned issuers," issuers who have been reporting for at least one year and, if they are offering new equity securities, have a public float of at least $75 million. 17 C.F.R. § 239.13 (2008).

**8.** We are aware that some courts, including the Tenth Circuit, have allowed plaintiffs to rely on the fraud on the market theory in the absence of an efficient market in the rare circumstance where the defendants' fraud created the very market itself for the securities, that is, the securities were worthless and wholly unmarketable but for the defendants' fraud. *See, e.g., Ross v. Bank*

Finally, we note that class's claims hinge on the *inefficiency* of the market for commercial UM/UIM insurance. If the market for such insurance were efficient, the price of the policies would impound, not some or most of the available public information, but *all* available public information, and it would do so immediately. *See, e.g., PolyMedica,* 432 F.3d at 14 (rejecting definition of efficient market as one that incorporates "most" publicly available information into price and clarifying that it is one where market price *"fully reflects all* publicly available information."); Gilson & Kraakman, *supra,* at 552 (Efficient market theory predicts that "even though information is *not* immediately and costlessly available to all participants, the market will act *as if* it were").

At the time the insureds purchased or renewed their UM/UIM policies, our decision in *DeHerrera* was published and publicly available. Thus, the market price would have incorporated our decision, and would have dropped to reflect its holding. If the market for commercial UM/UIM insurance were efficient, the defense of truth on the market would be available to the defendants. *See Basic,* 485 U.S. at 248–49, 108 S.Ct. 978 (if accurate information "credibly entered the market and dissipated the effects of the misstatements," then the misstatements would not be actionable); *In re Seagate Tech. II Secs. Litigation,* 843 F.Supp. 1341, 1368–69 (N.D.Cal.1994). Because, as discussed, the market for commercial UM/UIM insurance is not efficient, this defense is unavailable.

### B. Class–Wide Presumption of Causation Stemming from the Defendants' Alleged Material Omission

The plaintiff asserts an alternate theory of class-wide causation. He argues that the class members are entitled to a presumption or inference that they were harmed by the defendants' purported failure to disclose *De-*

*Herrera,* an allegedly material omission. The plaintiff and an amicus cite the Supreme Court's decision in *Affiliated Ute,* which held that in a class action for securities fraud brought under rule 10b–5, reliance could be presumed where the defendant withheld material information it was under some duty to disclose. 406 U.S. at 153–54, 92 S.Ct. 1456.

Although the plaintiff acknowledges that the Supreme Court's holding applied only to rule 10b–5 securities fraud class actions, he notes that other states have looked to *Affiliated Ute* in state consumer protection and fraud class actions. *See, e.g., Dix v. Am. Bankers Life Assurance Co.,* 429 Mich. 410, 415 N.W.2d 206, 209 n. 13 (1987); *Varacallo,* 752 A.2d at 817. Other jurisdictions, the plaintiff and the amicus note, have affirmatively established at least an inference of causation or reliance where there is a material uniform misrepresentation or omission in such class actions. *See, e.g., Vasquez v. Superior Court of San Joaquin Cty.,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, 972–73 (1971); *Baughman v. State Farm Mut. Auto. Ins. Co.,* 88 Ohio St.3d 480, 727 N.E.2d 1265, 1274–75 (2000). The amicus further argues that presumed reliance in material non-disclosure cases is supported by Colorado precedent establishing that fraud may be inferred from circumstantial evidence. *See, e.g., Kopeikin v. Merchants Mortgage & Trust Corp.,* 679 P.2d 599, 602 (Colo.1984); *Morrison v. Goodspeed,* 100 Colo. 470, 479, 68 P.2d 458, 463 (1937).

We hold that this argument, articulated for the first time in briefs to this court and not considered by the court of appeals, was insufficiently raised in the trial court and therefore we reach no opinion as to the merits of this argument. *See, e.g., People v. Salazar,* 964 P.2d 502, 507 (Colo.1998); *Boatright v. Derr,* 919 P.2d 221, 227 (Colo.1996). We note that there are arguments in favor of and

*South, N.A.,* 885 F.2d 723, 729 (11th Cir.1989); *Joseph v. Wiles,* 223 F.3d 1155, 1163–65 (10th Cir.2000). As the court explained in *Bank South,* the defendants' fraud in conspiring to bring the worthless securities to the market must be "so pervasive that it goes to the very existence of the [securities] and the validity of their presence on the market." 885 F.2d at 729. While we note that this type of claim does not really involve a

fraud *on* the market, since there is none, as much as a fraudulent scheme depicting the existence of a market that would not exist in the face of full disclosure, we do not need to pass on the merits of such a claim here. The undisputed facts establish that the class does not allege that the policies were worthless and wholly unmarketable.

against applying such a presumption or inference in order to maintain a consumer protection or common law fraud class action, and jurisdictions addressing the question have reached different results.[9]

## Conclusion

Upon review, we conclude that the court of appeals erred. The fraud on the market theory cannot be applied to maintain a class action under the facts of this case. For reasons stated, we do not consider the plaintiff's alternate theory of causation. In the trial court the plaintiff advanced no theory to establish causation and injury on a class-wide basis that could be used to maintain a class action. Hence, although we disagree with parts of the decertification order, we hold that the trial court did not abuse its discretion in decertifying the class.

We reverse the court of appeals' judgment and we remand this case to that court to be returned to the trial court with directions to enter judgment consistent with this opinion.

Justice MARTINEZ and Justice RICE do not participate.

---

**9.** *Compare Vasquez v. Superior Court of San Joaquin Cty.,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, 973 (1971) (upholding class certification and noting "if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class"); *Weinberg v. Hertz Corp.,* 116 A.D.2d 1, 499 N.Y.S.2d 693, 696 (1986) (in a class action fraud case involving omissions of material fact, finding "once it has been determined that the representations alleged are material and actionable, thus warranting certification, the issue of reliance may be presumed subject to such proof as is required on the trial."), *aff'd* 69 N.Y.2d 979, 516 N.Y.S.2d 652, 509 N.E.2d 347 (1987); *Cope v. Metro. Life Ins. Co.,* 82 Ohio St.3d 426, 696 N.E.2d 1001, 1008 (1998) (finding predominance requirement for certification met and allowing an inference or presumption of reliance on a non-disclosure of a material fact) *with Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1363 (11th Cir.2002) ("The securities market presents a wholly different context than a consumer fraud case, and neither this circuit nor the Supreme Court has extended a presumption of reliance outside the context of securities cases."), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.,* —— U.S. ——, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008); *Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 752 A.2d 200, 234–36 (2000) (reasoning that because class members with claims under state's consumer protection act would have to individually prove reliance on defendant's alleged misrepresentations and material omissions, class certification was inappropriate); *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675 (Tex.2002) (refusing to adopt class-wide presumption of reliance on misrepresentations made by defendant where it found "no evidence that purchasers *actually did* rely on [defendant's] statements so uniformly that common issues of reliance predominate over individual ones").