2018 PA Super 108

| | |
|---|---|
| MISTY M. SOMMERS, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| UPMC AND UPMC PRESBYTERIAN SHADYSIDE, | |
| APPEAL OF MISTY M. SOMMERS | No. 1202 WDA 2017 |

Appeal from the Order Entered, July 21, 2017,
in the Court of Common Pleas of Allegheny County,
Civil Division at No(s): GD-12-012901.

BEFORE: BOWES, OLSON, and KUNSELMAN, JJ.

OPINION BY KUNSELMAN, J.: FILED MAY 02, 2018

Before us is an interlocutory appeal from an order decertifying part of a class of nurses, who are suing their employer for unpaid wages. Because there were no later evidentiary developments in the litigation and common issues predominate over individual ones, we reverse and restore the class to its original composition.

## I. Facts and Procedural Background

Class Representative Misty Sommers sued the University of Pittsburgh Medical Center (UPMC) and its subsidiaries for unpaid wages nearly six years ago. The class alleged that UPMC owes nurses a shift differential of $1.00 per hour in "Urban and Community Hospitals" and $0.50 per hour in "Regional

Hospitals,"[1] if they have a Bachelor's of Science in Nursing (BSN) Degree. The nurses asserted claims for breach of contract; violation of the Wage Payment and Collection Law (WPCL), 43 P.S. § 206.1, et seq.; promissory estoppel; and quantum meruit.

Ms. Sommers began working for UPMC in 1998 when it acquired her then-employer, Presbyterian Hospital. Several years later, she learned of the BSN differential and that she and other nurses should have been receiving it. For example, UPMC Human Resources Manager Laura Zaspel emailed her, stating, "As you are aware, in July 2011, the differential for RNs in eligible positions who possess BSNs was increased from $.50 to $1.00." R.R. at 82a.

UPMC began correcting its payroll data to fix prior oversights of certain BSN nurses, to whom it owed the differential. Ms. Sommers testified:

> I just waited. Other co-workers were talking to human resources here and there, and I would hear back from them. And then it got to the point where it had been a couple of months, and that's when I called human resources myself.
>
> Q: What happened in that call?
>
> A: I was told that they were working on it, it was gonna take some time and there were thousands of nurses that were affected by this...

Deposition of Misty Sommers at 11-12, R.R. at 338a-339a.

Ms. Zaspel's email also indicated widespread underpayments. "Over the course of the last several months, steps have been taken to accurately,

_____

[1] UPMC defines what constitutes an "Urban," "Community," or "Regional" hospital. UPMC Compensation Manual: Fiscal Year 2011 at 9.

consistently and comprehensively determine the appropriate rate at which you, and others who may have been affected by this circumstance, should be paid." R.R. at 82a. Human resources described a "time and labor intensive" process that involved "leaders and staff from a number of departments, including Payroll Compensation, Retirement, HR and Legal working together to resolve this issue so that all impacted RNs will be appropriately compensated for the attainment of their BSN." Id. She assured Ms. Sommers that "executives in the HR and Legal departments are reviewing the data" and "[o]nce any salary adjustments and retroactive pay amounts are finalized and approved, you will be notified." Id. Those notifications of retroactive pay came via email three months later; they were identical in form and substance. R.R. at 362a, 363a.

Ten days later, UPMC sent a spreadsheet to Ms. Sommers calling the retroactive differential a "Back Wage Payment." R.R. at 343a. UPMC's wage repayment to Ms. Sommers ran from February 24, 2009 to February 25, 2012, and the spreadsheet reflected the standardized July 3, 2011 increase from $.50 to $1.00, described by Ms. Zaspel in her previous email. The total restitution from UPMC to Ms. Sommers was $4,397.73. Id. UPMC's computations included no interest or liquidated damages as mandated under the WPCL. Id. UPMC's Legal Department sent a substantially similar spreadsheet to another nurse, Danielle Gregory, which also called the differential a "Back Wage Payment;" ran from February 24, 2009 to February

25, 2012; reflected the standardized July 3, 2011 increase; and included no interest or liquidated damages. R.R. at 364a.

Ms. Sommers thought that UPMC's retroactive payments were legally insufficient, so, in July of 2012, she filed this class action.

Originally, the case was assigned to Allegheny County Court of Common Pleas Judge R. Stanton Wettick, Jr. In response to interrogatories, UPMC produced the names of 91 nurses at Magee-Women's Hospital of UPMC "who were retroactively paid the BSN differential effective July 3, 2011" and "eleven BSNs who UPMC Presbyterian Shadyside identified as having not received the BSN differential and who were ultimately paid retroactively in March 2012." R.R. at 351a.

After pleadings closed, Ms. Sommers moved for class certification. The trial court declined to certify a class action as to UPMC Presbyterian Shadyside for lack of numerosity, because only eleven of its nurses had claims similar to Ms. Sommers'. Wettick Opinion, 3/2/15 at 2, R.R. at 394a. However, Judge Wettick found that UPMC itself was an "employer" under the WPCL, and he certified Ms. Sommers' representation as to UPMC for a class consisting "of all individuals employed by any UPMC subsidiary and/or business unit at any time on or after February 23, 2006 who should have received but did not receive all or any portion of the regular or overtime BSN Differential from February

23, 2006 to present."[2]  Wettick Order, 3/2/15 at 2.   He held that Ms. Sommers and other nurses at UPMC Presbyterian Shadyside had commonality with their UMPC-wide colleagues, because UPMC set the compensation plans for all of its subsidiaries.   Judge Wettick explained:

> UPMC contends that the evidence offered by the plaintiffs does not show a corporate-wide response to unpaid differentials.  I disagree.  The record shows that it is the practice of UPMC to adopt system-wide corporate policies for personnel matters impacting more than one subsidiary.  Thus, if there were numerous nurses with BSN degrees employed by other subsidiaries who also received a three-year retroactive payment, this would support a finding that the three-year payment was a corporate-wide policy.

Wettick Opinion at 6.

He ordered UPMC to identify all class members.  UPMC then identified a class of "at least 330 nurses 'who should have, but did not, receive a BSN Wage Differential' during the time frame relevant to this matter."  R.R. at 417a.

When confronted with lists of 337 nurses, UPMC Compensation Director Gary DuJordan acknowledged that UPMC owed them the differential and that UPMC made retroactive payments to some of them because of the suit.

> Q: But the calculation that's reflected here of the amount owed is based on hours she worked; is that right?
>
> A: Yes.

_____

[2] For ease of discussion, we refer to this group of plaintiffs as the "Original Class."

Q: That she wasn't paid for; is that right?

A: Hours worked that she wasn't paid for when she had the BSN — she should have had the BSN differential.

Q: I understand.

You had mentioned a minute ago in your answer that it was based on — nurses who had payout is what you said; what do you mean, a payout?

A: We actually audited our nurses to see if there were any nurses beyond the original 11 in the lawsuit that didn't have payment for the BSN differential, and through this audit process we discovered that they didn't.

We then went back three years and made payments to them based on that.

Q: And it was the filing of the Sommers' lawsuit that caused you to undertake that analysis; is that right?

A: Yes.

Deposition of Gary DuJordan, at 13-14, R.R. at 569a.

Further inquiry revealed that UPMC had repaid only a part of the Original Class. "Only the actual active employees that we did the original analysis…did we make the actual payments to[, because w]e thought that was the right thing to do." Id. at 21, R.R. at 576a. Thus, nurses who transferred jobs or left UPMC have received no backpay, despite being in the Original Class. Id. at 23, 28; R.R at 578a, 583a.

After creating subcategories of repaid nurses and unpaid nurses, UPMC moved for summary judgment and total decertification of the class. Judge Wettick retired shortly thereafter, and the case was reassigned to Judge Robert J. Colville. On May 11, 2017, Judge Colville denied summary judgment

to all parties, but he granted UPMC partial decertification. He allowed Ms. Sommers to continue representing the partially-repaid nurses but removed all unpaid nurses from the class.

This interlocutory appeal followed under Pennsylvania Rule of Appellate Procedure 313.[3]

_____

[3]                              Rule 313. Collateral Orders

> (a) General rule. An appeal may be taken as of right from a collateral order of an administrative agency or lower court.
>
> (b) Definition. A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313.

"As an order denying class certification is appealable under the collateral order doctrine, we conclude that the trial court's order, to the extent that it decertifies the class action, is appealable." Clark v. Pfizer, Inc., 990 A.2d 17, 23 n. 3 (Pa. Super. 2010) (citations omitted), appeal denied, 13 A.3d 473 (Pa. 2010).

Prior to oral argument this Court questioned whether it or the Commonwealth Court of Pennsylvania has jurisdiction over this appeal under 42 Pa.C.S. § 706(a)(5). At oral arguments, both sides argued that this Court has proper jurisdiction, because the WPCL is "right in the Superior Court's wheelhouse."

The application of 42 Pa.C.S. § 706(a)(5) to ascertain whether appellate jurisdiction lies in this Court or the Commonwealth Court is a question of law, which we may raise sua sponte. Commonwealth v. Shearer, 882 A.2d 462, 465 n. 4 (Pa. 2005). Because this is a pure question of law, the scope of review is plenary and the standard of review de novo. Snead v. Society for Prevention of Cruelty to Animals of Pennsylvania, 985 A.2d 909 (Pa. 2009). Under Section 706(a)(5) appellate jurisdiction could lie in the

## II. Scope & Standard of Review

This Court reviews an order to certify or decertify class action members for an abuse of discretion. Janicik v. Prudential Ins. Co. of America, 451 A.2d 451 (Pa. Super. 1982). An "order concerning class certification will not be disturbed on appeal unless the court failed to consider the requirements of the rules or abused its discretion in applying them." Id. at 454.

> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record, discretion is abused. We emphasize that an abuse of discretion may not be found merely because the appellate court might have reached a different conclusion, but requires a showing of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous.

Paden v. Baker Concrete Construction Co., Inc., 658 A.2d 341, 343 (Pa. 1995).

In performing an abuse of discretion review, when a trial court's application of the underlying law is called into question, as it is here, it heightens "our standard of review [to] de novo, and our scope of review is plenary" as to the underlying question of law. Snead v. Society for

_____

Commonwealth Court, because the application of the WPCL to UPMC — a nonprofit corporation — implicates both its "corporate affairs" and the affairs of its employees. However, as both sides expressly consented to jurisdiction in this Court, its jurisdiction may be "perfected" pursuant to 42 Pa.C.S. § 704 (providing for appellate jurisdiction via appellee's waiver of objection and with the court's indulgence). We hold that it is now so "perfected," and whatever obstruction that possibly arose from Section 706(a)(5) is hereby removed.

Prevention of Cruelty to Animals of Pennsylvania, 985 A.2d 909, (Pa. 2009).

### III. Analysis

Although the nurses raised four issues on appeal, they condensed them to two arguments as to why we should return the unpaid nurses to the Original Class. First, they attacked decertification procedurally: i.e., the Original Class should have gone undisturbed, because UPMC's post-complaint creation of subgroups is not a later development in the litigation. Second, they argued that common issues of fact and law predominate, because the BSN differential is a statutory "wage" under the WPCL that all similarly situated nurses earned by working the same hours, at the same hospitals, on the same jobs, with the same BSN degrees.

UPMC countered that there is no commonality of evidence showing that it had any obligation to pay the BSN differential to unpaid nurses. In order for those nurses to recover, it said, they each need proof that it owes them the "wage" on an individual basis. UPMC provided no answer to the nurses' procedural argument.

We will address each of the nurses' arguments in turn.

A. Without a Later Evidentiary Development, the Trial Court Has No Authority to Revisit the Certification Order.

Once a trial court orders class certification, Rule 1710 of Civil Procedure[4] permits it to revisit that decision. But this Court has limited such changes to only when "later developments in the litigation reveal that some prerequisite to certification is not satisfied." Janicik, 451 A.2d at 445.

For instance, in Clark v. Pfizer, Inc., 990 A.2d 17 (Pa. Super. 2010), appeal denied, 13 A.3d 473 (Pa. 2010), this Court, applying Janicik,[5] affirmed

_____

[4] "An order under this rule may be conditional and, before a decision on the merits, may be revoked, altered or amended by the court on its own motion or on the motion of any party." Pa.R.C.P. 1710(d).

[5] The Clark court also cataloged cases from other courts to underscore the general rule that a trial court may…

> reassess class certification when changed circumstances arise. See, e.g., Farmers Ins. Exch. v. Benzing, 206 P.3d 812 (Colo. 2009) ("Generally, we agree that trial courts should not consider decertification without the discovery of new facts or changes in the law or positions of the parties."); Rivera v. Veterans Mem'l Med. Ctr., 262 Conn. 730, 818 A.2d 731, 738 (2003) (stating that "a class once certified on the basis of the requirements of [the class action rules] should be decertified only where it is clear there exist changed circumstances making continued class action treatment improper."); Key v. Jewel Cos., 176 Ill.App.3d 91, 125 Ill.Dec. 652, 530 N.E.2d 1061, 1066 (1988) (stating that a court could alter a certification order after a decision on the merits "where warranted by more complete discovery."). In interpreting language identical to Pa.R.C.P. 1710(d), the United States Court of Appeals for the Third Circuit has held that this exception holds true even when a trial court first renders a decision during the summary judgment phase in favor of the defendant and then decides to decertify the class action. Barnes v. American Tobacco Co., 161 F.3d 127, 140 (3d Cir.1998) (decertifying class after summary judgment); see Fireside Bank v. Superior

decertification of an entire class. The Clarks had sued Pfizer for various torts, alleging that Pfizer's marketing caused doctors to prescribe its drug, Neurontin, off-label.[6] The Clarks offered an expert on prescription trends as their prima facie case for class certification. In discovery, Pfizer "adduced evidence to prove that doctors in Pennsylvania have prescribed off-label use of Neurontin to class members for reasons wholly unrelated to [its] alleged fraudulent marketing." Id. at 27. This "adduced evidence" was a later development in that ligation; procedurally, it justified revisiting the certification question. Id.

In this case, the nurses contend that the trial court had no reason to revisit certification, because UPMC's self-manufactured subcategories are not later developments in litigation. Instead, they castigate those subcategories as a "fiction created by UPMC in this litigation as an afterthought in order to set up the argument which the lower court ultimately used to rationalize decertification" and as a "unilateral manipulation of the record." Ms.

_____

Court, 40 Cal.4th 1069, 56 Cal.Rptr.3d 861, 155 P.3d 268, 276 (2007) ("Before judgment, a class should be decertified 'only where it is clear there exist changed circumstances making continued class action treatment improper.' A fortiori, a similar showing must be made to warrant decertification after a decision on the merits.")

Clark, supra. 29.

[6] "Off-label" is medical lingo. It occurs when a doctor prescribes a drug for a treatment, even though the U.S. Food and Drug Administration (FDA) has not approved it for that treatment. Doctors are free to exercise their professional judgement to proscribe FDA-approved drugs for any use they see fit, but drug makers may not promote their wares for off-label uses.

Sommers' Brief, at 13 (emphasis in original).  Given UPMC's total failure to respond to this argument and the absence of newly discovered evidence of record, we agree.

Notably, UPMC attempts to avoid the issue altogether.  In its Brief, UPMC would have us restrict the nurses' appeal to "[w]hether the lower court abused its discretion in holding that employees to whom no retroactive payments were made (i.e., the "transferred" and "terminated" categories) should be excluded from the class action?"  UPMC's Brief, at 1.  Indeed, Janicik, the wellspring of our decertification jurisprudence, makes no appearance in UPMC's Brief, despite UPMC and both trial judges having previously relied upon the case.  For example, UPMC argued that the trial court "'may revoke, alter, or amend the Certified Order where later developments reveal that some prerequisite to certification is not satisfied...'"  Defendants' Brief in Support of Motions for Summary Judgement and Decertification at 16, T.C.R. at 1418 (quoting Wettick Opinion at 6) (emphasis added).[7]  Or, as Judge Colville correctly stated, "In the absence of some new evidentiary revelation proffered by UPMC, Judge Wettick's certification Order will stand."  Colville Opinion at 3

_____

[7] This portion of Judge Wettick's Opinion relied upon Samuel-Bassett v. Kia Motors America, Inc., 34 A.3d 1, 34 (Pa. 2011) and Debbs v. Chrysler Corp., 810 A.2d 137, 153 (Pa. Super. 2002).  Both opinions cite to Janicik v. Prudential Ins. Co. of America, 451 A.2d 451 (Pa. Super. 1982) for the proposition that "Even if the class is certified, before a decision on the merits, the certification order 'may be revoked, altered or amended by the court on its own motion or on the motion of any party.' Pa.R.C.P. No. 1710(d). See Janicik...(court has extensive powers to protect absent class members and to ensure efficient conduct of class action)."  Samuel-Bassett, supra. 16; and see also Debbs, 810 A.2d at 153 (quoting Janicik, 415 A.2d at 455).

(emphasis added). But neither Judge Colville nor UPMC identified any new evidentiary revelations.

All parties agree that decertification had no connection to new evidence. "The critical factor in Judge Colville's decertification decision was the absence of evidence of a contractual right to be paid the BSN Differential; that is, the absence of any evidence of an offer and acceptance." UPMC's Brief at 15 (emphasis added). Hence, the judge's inquiry was actually a reevaluation of the nurses' prima facie case. Thus, the only later development in this case was that Judge Wettick retired. Thereafter, UPMC requested reconsideration of the class certification. "The Defendants respectfully submit that the Court should reconsider its decision to certify this case as a class action at all." Defendants' Brief in Support of Motions at 16, T.C.R. at 1418. But, without new evidence of record, Judge Wettick's certification must stand.

UPMC's efforts to create subcategories of nurses, a unilateral dissection of the Original Class, was not based upon any "later developments in the litigation." Janicik, supra. At the time Judge Wettick certified the class, he knew that a subset of BSN nurses had received three years' backpay. Pre-certification, UPMC had identified 102 nurses to whom it had made partial restitution. R.R. at 351a. Had Judge Wettick wanted to certify a class of only those nurses with the unique "quasi-admission"[8] of backpay, Judge Wettick

_____

[8] Judge Colville first coined the phrase "quasi-admission" in reference to UPMC's backpay. See Colville Opinion at 4. This Opinion uses it in the same manner and sense that he did.

certainly could have done so. Instead, he certified a class of nurses "who should have received but did not receive all or any portion of the regular or overtime BSN Differential…" Wettick 3/2/15 Order at 2 (emphasis added). The nurses who did not receive all of the BSN differential are those whom UPMC has partially repaid, while those who did not receive any of the BSN differential are the unpaid nurses. Thus, Judge Wettick's original intent was for any "quasi-admission" to extend to all nurses, similarly situated at the time of underpaid employment, regardless of the extent of UPMC's repayment.

As he made clear in his Opinion in favor of certification:

> A May 2012 publication titled UPMC Nursing Pathways to Excellence provided to UPMC's more than 11,000 nurses, addressed Baccalaureate and Advanced Degrees. It described the following benefit available to all of its nurses:
>
> > UPMC acknowledges baccalaureate-prepared nurses at the bedside with a BSN-differential of $1 an hour in the urban and community hospitals, and $0.50 in the regional hospitals.
>
> UPMC contends that the evidence offered by the plaintiffs does not show a corporate-wide response to unpaid differentials. I disagree. The record shows that it is the practice of UPMC to adopt system-wide corporate policies for personnel matters impacting more than one subsidiary.

Wettick Opinion at 5-6. UPMC's Compensation Director has admitted that the unpaid nurses did not receive "any portion of the regular or overtime BSN Differential," Wettick 3/2/15 Order at 2, and that, because of this fact, they were a part of the Original Class. R.R. at 576a, 583a. Judge Colville never explains what new evidence came to light that caused those nurses to forfeit their class membership, besides the fact that they were unpaid.

Thus, Judge Colville revisited Judge Wettick's initial ruling to certify and impermissibly reversed him without any newly discovered evidence, proffered by UPMC, upon which to base his reevaluation. Accordingly, we conclude that the trial court's decertification misapplied Pa.R.C.P. 1710 as interpreted in Janicik. Therefore, procedurally speaking, this decertification of a portion of the Original Class constituted an abuse of discretion.

B. The Employment Law of This Commonwealth Requires That the Original Class Proceed, in Unity, as Previously Certified.

To determine who may be included in a class action, we start with Rule 1702 of Civil Procedure. It provides:

One or more members of a class may sue...as representative parties on behalf of all members in a class action only if:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4)     the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

(5)     a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

Pa.R.C.P. 1702. Also, "a class action is a fair and efficient method of adjudicating the controversy" when "common questions of law or fact predominate over any question affecting only individual members..." Pa.R.C.P 1708.

When applying the Rules of Civil Procedure regarding class certification or decertification, the trial courts' "decisions should be made liberally and in favor of maintaining a class action. This is because such suits enable the assertion of claims that, in all likelihood, would not otherwise be litigated." Weinburg v. Sun Co., 740 A.2d 1152, 1162 (Pa. Super. 1999), reversed in part on other grounds, 777 A.2d 442 (Pa. 2001), (citations and quotation marks omitted). This is "a mixed question of fact and law." Debbs v. Chrysler Corp., 810 A.2d 137, 154 (Pa. Super. 2002). In deciding the class issue, the trial court is not to invade the province of the fact finder by considering the case's merits, but it "may need to examine the elements of the underlying causes of action in order to dispose of class issues properly." Id.

Ms. Sommers argues that she has satisfied all five of Pa.R.C.P. 1702's prima facie requirements, so that she may continue as Class Representative for the Original Class. To support her position, she essentially raises three points. First, UPMC's partial repayment of the differential to active nurses constituted an admission that the differential was a wage owed to all similarly situated nurses; however, the trial court erroneously limited the admission's applicability to the 150 nurse who received it. Second, the trial court failed to consider the totality of UPMC's corporate-wide practices of treating similarly situated nurses similarly. And third, the trial court misapplied the case law.

For its part, UPMC expounds upon Judge Colville's Opinion. UPMC claims that Ms. Sommers produced no evidence of a class-wide offer or acceptance

of the differential. Hence, it argues that each nurse must prove a contractual right to the BSN differential on an individualized basis. In UPMC's and Judge Colville's views, this means that any common issues of fact or law that Ms. Sommers shares with the unpaid nurses will not predominate over questions of personal contract formation.

The trial court's decision to decertify rests entirely upon its conclusion that UPMC's "quasi-admission" via partial repayment extends to only active nurses. Because this limitation on the inferences that a jury may draw from that "quasi-admission" is manifestly unreasonable, the decision to decertify was an abuse of discretion. We do not see how partial repayments by UPMC may be evidentiary admissions as to some of the Original Class but not as to all of them.

Judge Colville began his Opinion by acknowledging that "retroactive payment may be viewed as a 'quasi-admission' of UPMC." Colville Opinion at 4. Although we are not sure what is "quasi" about the "admission," we do agree that the backpay "is a common fact that supports the claim that each of the [repaid nurses] was entitled to the differential payments. There is no evidence that the retroactive payment was a settlement payment or anything other than a wage payment." Id.

Judge Colville then properly noted that the backpay's implications "must be decided in a different proceeding." Id. at 4, n. 4. We presume by "different proceeding" he meant a jury trial. If so, he was correct, because determining why UPMC undertook repayments in the first instance goes to the heart of the

four causes of action. Hence, that determination lies beyond both Judge Colville's authority and ours. "Here, for purposes of class decertification, it is sufficient that UPMC's retroactive payment establishes a common issue of fact and law and may eliminate the need for individual inquiry as to whether each putative class member has standing." Id.

> This common issue of fact and law also binds the claims for breach of contract, promissory estoppel, and quantum meruit for purposes of establishing a contractual right or promise on a class-wide basis. This is because UPMC's retroactive payment is arguably performance of a contractual obligation or promise.

Id. at 5. Here, too, the judge was correct. UPMC's retroactive repayments could only have been one of two things: (A) restitution for unpaid wages that were due and owing under a legal obligation to all differential-eligible nurses with a BSN or (B) bonuses/gifts from UPMC to select nurses. Only a jury may decide which they were.

But the trial court's analysis on page six fails. He held that "[r]etroactive payment to [repaid] nurses is a common binding fact, and, coupled with the additional fact that the differential payment is a wage under the WPCL, affords [repaid nurses] a unique 'quasi-admission' of UPMC, as discussed supra." Id. at 6. The trial court refused to extend the potential admission to the unpaid nurses, because they have never been paid the differential. Id. He therefore concluded that "UPMC has not acted so as to arguably establish [its] rights to receive the differential wage payment." Id. This limitation of the admission's

scope is not simply an error in judgment; it's manifestly unreasonable, because the conclusion does not logically follow from its stated premise.

If a jury decides that the backpay was partial performance of a UPMC-wide legal obligation to pay the differential, such an enterprise-wide obligation would run to all Original Class members, because they all worked under the same UPMC-wide terms and conditions of employment. This derives from the case's common issue of facts and law: namely – was the differential a legally binding part of UPMC's corporate-wide employment compensation during the nurses' employment? The question is not: which nurses did UPMC unilaterally find worthy of restitution, after the fact? If it were, future class defendants could self-determine their liability by repaying only part of the class, because partial repayment would end commonality between paid and unpaid class members. Allowing class action defendants to self-regulate class size in this manner would be absurd.

Instead, as this Court has explained, a common issue of fact or law:

> will generally exist if the class members' legal grievances are directly traceable to the same practice or course of conduct on the part of the class opponent. The common question of fact [requirement] means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all.

Clark, supra. 24 (citations and quotation marks omitted, emphasis in original). There is no doubt that all of the BSN-educated nurses' legal and factual claims arise from the same practices of UPMC. Indeed, UPMC has admitted that paying the BSN differential was a practice. "[T]he practice had

been that, once a nurse acquired their BSN, that if the paperwork was appropriately processed, that they should be receiving the differential." Deposition of UPMC Presbyterian's HR Manager Laura Zaspel at 23, R.R. at 300a (emphasis added). Ms. Sommers and the Original Class have alleged that this common practice stems from UPMC's contractual obligations, promissory estoppel, quantum meruit, and/or the WPCL, as to all BSN nurses who worked during the same shifts, in the same hospitals, in the same BSN-eligible positions. Whether they will produce sufficient evidence to convince a jury that they are entitled to recover under any of their theories is not now before us.

What matters is evidence of record indicates UPMC admitted that it employed BSN nurses in various subsidiary hospitals, to whom it said it should have paid the differential, but did not. UPMC did this through emails, spreadsheets of unpaid back wages, a newsletter, various depositions, and — most importantly — by actually paying the BSN differential to half the 337 nurses. In other words, the Original Class' best class-wide evidence, from which a jury may conclude that UPMC made a legally enforceable promise, is that it undertook steps to fulfill that obligation by starting to pay some of them. That evidence, in light of the rest of the record, goes to the common question of what those repayments are. And that question predominates over the niceties of individual contract formation, because the parties' course of conduct may convince a jury that their conduct arose from an underlying

contract or legally-enforceable promise.  As this Court said in Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 942 (Pa. Super. 2011):

> An offer of acceptance need not be identifiable and the moment of formation need not be precisely pinpointed.  In general, there is an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient, in the absence of a showing to the contrary.

Thus, UPMC's preoccupation with the need for each nurse to testify as to the exact instant when she or he agreed to receive an hourly pay increase is a red herring.

If the jury finds that UPMC, more probably than not, repaid Ms. Sommers because the BSN differential was due and owed to her as a part of her WPCL "wages," then it follows that this is why it made similar repayments to 150 other nurses.  And if the BSN differential was also due and owed to them as a part of their WPCL "wages," then it follows that it was also due and owed to the remainder of the Original Class.

Thus, there is no reason to distinguish unpaid nurses from partially-repaid ones.  They all share the same common facts of UPMC employing them to do the same work, in the same hospitals, in the same positions, with the same degrees, under the same corporate-wide policies and publications, and for the same compensation.

## IV. Conclusion

By both misapplying Rule 1710 of Civil Procedure and limiting the scope of UPMC's admission, via partial restitution, without reasonable justification,

the trial court abused its discretion. We therefore reverse that portion of its July 21, 2017 Order which decertified unpaid nurses from this case and reinstate the Original Class as found in Judge Wettick's 3/2/15 Order.

Order reversed. Case remanded for jury trial consistent with this Opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/2/2018